## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | |
|---|---|
| **JOSEPH GABRIEL WIREMAN,** ) | |
|     Plaintiff ) | |
| v. ) | Civil Action No. 2:17cv00019 |
| ) | **REPORT AND** |
| **NANCY A. BERRYHILL,** ) | **RECOMMENDATION** |
| **Acting Commissioner of** ) | |
| **Social Security,** ) | |
|     Defendant ) | By:   PAMELA MEADE SARGENT |
| ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Joseph Gabriel Wireman, ("Wireman"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011, West 2012 & Supp. 2017). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Oral argument has not been requested by the parties. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wireman protectively filed his applications for DIB and SSI on November 1, 2012, alleging disability as of October 27, 2012, based on colorectal cancer, pain in his low back and right knee and leg numbness. (Record, ("R."), at 269-79, 280, 292-303, 304-05.) The claims were denied initially and upon reconsideration. (R. at 96-119, 122-43, 148-50, 155-57, 161-62, 163-65, 167-69, 170-72, 174-76.) Wireman then requested a hearing before an administrative law judge, ("ALJ"). (R. at 178-79.) A video hearing was held on October 22, 2015, at which Wireman was represented by counsel. (R. at 54-89.) A supplemental video hearing was held on June 7, 2016, at which Wireman also was represented by counsel. (R. at 36-53.)

By decision dated June 22, 2016, the ALJ denied Wireman's claims. (R. at 17-30.) The ALJ found that Wireman met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016. (R. at 20.) The ALJ found that Wireman had not engaged in substantial gainful activity since October 27, 2012, the alleged onset date. (R. at 20.) The ALJ found that the medical evidence established that Wireman had severe impairments, namely history of colorectal cancer in 2008 with J-pouch, without recurrence, degenerative disc disease of the lumbar spine and degenerative joint disease of the right knee, but he found that Wireman did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20-21.) The ALJ found that

Wireman had the residual functional capacity to perform sedentary work[1] that required him to lift items weighing up to 20 pounds occasionally and 10 pounds frequently, perform no more than occasional pushing/pulling, operation of foot controls, balancing, stooping, kneeling, climbing of ramps or stairs or reaching overhead and perform no crouching, crawling or climbing of ladders, ropes or scaffolds. (R. at 21-28.) The ALJ also found that Wireman needed to avoid even moderate exposure to hazards, such as moving machinery and heights. (R. at 21.) The ALJ found that Wireman was unable to perform any of his past relevant work. (R. at 28.) Based on Wireman's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Wireman could perform, including the jobs of an assembler, a stuffer and a gauger (R. at 29-30.) Thus, the ALJ concluded that Wireman was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 30.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2017).

After the ALJ issued his decision, Wireman pursued his administrative appeals, (R. at 12-13), but the Appeals Council denied his request for review. (R. at 1-3.) Wireman then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2017). This case is before this court on Wireman's motion for summary judgment filed November 22, 2017, and the Commissioner's motion for summary judgment filed December 21, 2017.

---

[1] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2017).

## II. Facts

Wireman was born in 1967, (R. at 40, 59), which classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) on the date of his alleged disability onset. Wireman obtained his general education development, ("GED"), diploma. (R. at 58, 60.) He has past relevant work experience as a truck driver. (R. at 58, 60.)

At his 2015 hearing, Wireman testified that he had difficulty having bowel movements since his surgery for colorectal cancer, with alternating bouts of constipation and diarrhea. (R. at 60-64.) Wireman also testified that he had back problems from an injury he suffered in 1996. (R. at 67-68.) Wireman complained of suffering from sharp pain and numbness in his feet and legs. (R. at 69.) Wireman testified that he could walk only 100 yards before sitting down. (R at 70.) He said that he could stand for only five to 10 minutes at a time. (R. at 72.) Wireman also stated that he had problems with his right knee, which caused it to swell up "the size of a grapefruit." (R. at 77.)

John F. Newman, a vocational expert, also was present and testified at Wireman's 2015 hearing. (R. at 83-87.) Newman was asked to consider a hypothetical individual of Wireman's age, education and work history, who could lift items weighing up to 20 pounds occasionally and 10 pounds frequently; who could stand and walk for about two hours and sit for up to six hours in an eight-hour workday, who could never climb ladders, ropes or scaffolds, crouch or crawl, but who could occasionally climb ramps or stairs, balance, stoop, kneel, push/pull, operate foot controls and reach overhead and who needed to avoid even moderate exposure to hazards such as moving machinery and heights. (R. at 85.) Newman stated that, the hypothetical presented was at the sedentary exertional level. (R. at

85.) He stated that the individual could perform other jobs at the sedentary level existing in significant numbers in the national economy, including jobs as an assembler, a stuffer and a gauger. (R. at 86.)

At his supplemental hearing in 2016, Wireman stating that he had started having more problems with his right shoulder since his 2015 hearing. (R. at 41.) Wireman testified that he could not raise his arm to shoulder level and that he could not lift with his right arm. (R. at 41.) Wireman also complained of neck pain and severe headaches. (R. at 43.) Wireman testified that he continued to have problems with pain, constipation and diarrhea after surgery for colorectal cancer. (R. at 45-46.) Wireman stated that he could sit for only 45 minutes at a time before he experienced severe pain. (R. at 45-46.)

Ashley D. Wells, a vocational expert, also was present and testified at Wireman's 2016 hearing. (R. at 48-51.) Wells was asked to consider a hypothetical individual of Wireman's age, education and work history, who could lift items weighing up to 20 pounds occasionally and 10 pounds frequently; who could stand and walk for about two hours and sit for up to six hours with a sit/stand option, who could never climb ladders, ropes or scaffolds, but who could occasionally climb ramps or stairs, balance, stoop, kneel crouch, crawl, push/pull, operate foot controls and overhead reach with left extremity and who needed to avoid concentrated exposure to cold and heat and even moderate exposure to hazards such as moving machinery and heights. (R. at 49-50.) She stated that the individual would be unable to perform Wireman's past work. (R. at 50.) Wells stated that, the hypothetical presented was at the sedentary exertional level. (R. at 50.) She stated that the individual could perform other jobs at the sedentary level existing in significant numbers in the national economy, including jobs as an addressing clerk, an assembler and a cuff folder. (R. at 50.)

In rendering his decision, the ALJ reviewed records from state agency physician Dr. William Amos, M.D.; Norton Community Hospital; Dr. Kevin Blackwell, D.O.; Johnston Memorial Hospital; Dr. James Mann, M.D.; Blueridge Medical Specialist; Mountain States Medical Group Internal Medicine; Community Clinic; Abingdon Surgical Associates; Abingdon Medical Associates; and Dr. Sung-Joon Cho, M.D.

Dr. James A. Mann, M.D., performed a colonoscopy on Wireman on July 15, 2008, which revealed a rectal tumor. (R. at 510.) A biopsy of the mass showed it was cancerous. (R. at 512.) On July 29, 2008, Dr. Paul Armstrong, M.D., saw Wireman regarding removal of the mass in his colon. (R. at 407-08, 494-95.) Dr. Armstrong noted that a biopsy of the mass had shown it to be cancerous. (R. at 407.) Wireman reported that he had some blood in his stool and underwent a colonoscopy which revealed the mass. (R. at 407.) He stated that his father had died of colon cancer, and his brother was diagnosed with metastatic colon cancer the previous year. (R. at 407.) On July 30, 2008, Dr. Armstrong performed a transanal excision of the rectal lesion on Wireman. (R. at 410-11.)

Wireman saw Dr. Armstrong again on August 5, 2008. (R. at 406.) Dr. Armstrong noted that the final pathology on Wireman's rectal mass showed invasion into the submucosa requiring further surgery to give him the best chance for long-term cure. (R. at 406.) Dr. Armstrong stated that he thought he could spare Wireman's sphincter, but that his colon would need to be diverted with colostomy for at least eight to 12 weeks to allow healing. (R. at 406.) Dr. Armstrong stated that he would give Wireman three weeks to heal from his recent procedure and bring him back to discuss the timing of the next procedure. (R. at 406.) Wireman returned on August 28, 2008, to further discuss and schedule the next surgery. (R. at 405.)

On September 29, 2008, Dr. Armstrong and Dr. David Smith, M.D., performed colorectal cancer surgery on Wireman. (R. at 413-15.) Wireman was discharged home on October 3, 2008. (R. at 412.) Wireman saw Dr. Armstrong on October 16, 2008, for recheck of his incision and removal of his staples. (R. at 403.) Dr. Armstrong noted that if all went well, Wireman would undergo an ileostomy takedown procedure to correct the colostomy in the next five to six weeks. (R. at 403.) Dr. Armstrong saw Wireman again on November 11, 2008. (R. at 399.) Dr. Armstrong noted that Wireman was doing well and was eager to undergo the ileostomy takedown procedure soon. (R. at 399.) Wireman underwent that procedure on November 26, 2008, and was discharged the following day. (R. at 419.) On December 5, 2008, Dr. Armstrong noted the Wireman was doing well after the ilestomy takedown with some complaints of constipation. (R. at 396.) Dr. Armstrong saw Wireman again on January 6, 2009, and allowed him to return to work. (R. at 395.)

Wireman saw Dr. Mann on August 5, 2010, for complaints of upper abdominal pain. (R. at 460-61.) Wireman reported that the pain worsened when he needed to have a bowel movement and lessened after having a bowel movement. (R. at 460.) He stated that he had a bowel movement only about once a week. (R. at 460.) Wireman stated that he had sharp pain, but no lower abdominal cramping. (R. at 460.) Dr. Mann recommended a follow-up colonoscopy, which he performed on August 18, 2010. (R. at 462.) During the colonoscopy, Dr. Mann removed a polypoid lesion of 1 cm in diameter. (R. at 462.) He also noted that Wireman suffered from rectal stricture and internal hemorrhoids. (R. at 462.) The lesion was determined to be fragments of normal colonic mucosa. (R. at 464.)

Wireman returned to Dr. Armstrong on June 30, 2011, to schedule a follow-up colonoscopy. (R. at 392-93.) Dr. Armstrong performed this colonoscopy on

August 15, 2011. (R. at 420.) Dr. Armstrong excised three polyps from Wireman's colon; otherwise the procedure revealed no abnormalities. (R. at 420.)

Dr. Lisa A. McKinney-Smith, D.O., saw Wireman on September 9, 2011, regarding nodules in his right lung discovered on CT scan. (R. at 433-35.) Wireman stated that he had smoked for 25 years and was trying to quit. (R. at 433.) Wireman said that he had an occasional cough and very occasional wheeze, but he denied any shortness of breath, smothering or sputum production. (R. at 433.) Wireman complained of significant gastrointestinal complaints, generalized joint pain and a history of surgical treatment for rectal cancer. (R. at 433.)

Dr. McKinney-Smith stated that a recent CT scan had shown a 3mm noncalcified nodule adjacent to the pleura in Wireman's right middle lobe and a 2 mm noncalcified nodule in his right lung base. (R. at 434.) Wireman was given the option of a surgical consultation with bronchoscopy and pathology answer, but he decided to proceed conservatively with a follow-up CT scan in three months. (R. at 434.) Dr. McKinney-Smith stated that she would see Wireman again after follow-up CT scan in three months. (R. at 435.) A follow-up CT scan on December 12, 2011, showed that Wireman's pulmonary nodules had decreased in size or resolved. (R. at 439.)

Wireman presented to the emergency department at Johnston Memorial Hospital with rectal bleeding on April 23, 2012. (R. at 364-76.) Wireman reported that he had surgery for colorectal cancer four years earlier with some muscle around his rectum removed. (R. at 364, 368.) He stated that he had a colonoscopy performed in December 2011. (R. at 363-64.) Wireman appeared in no acute distress, and all examinations were normal other than for some mild tenderness to palpation in his lower abdomen. (R. at 364-65.) A CT scan of Wireman's abdomen

showed no acute findings. (R. at 377-78.) It was recommended that Wireman follow up with his surgeon and schedule another colonoscopy. (R. at 366.)

Dr. Kevin Blackwell, D.O., performed a consultative examination of Wireman at the request of the state agency on May 8, 2013. (R. at 518-21.) Wireman complained of abdominal pain and difficulty with bowel movements after surgery to correct colon cancer. (R. at 518.) Wireman complained of being constipated for "weeks at a time." (R. at 518.) He said the pain was excruciating at times. (R. at 518.) Wireman said he also had two spots on his lungs and carpal tunnel syndrome in his left hand. (R. at 518.) Wireman said that he could not grip well in either hand. (R. at 518.) He also complained of pain in his right knee, which worsened with activity or standing. (R. at 518.) Wireman said that his knee would swell and give way on him. (R. at 518.) He also complained of back pain that radiated into his hips, on the right worse than the left. (R. at 518.)

Dr. Blackwell noted that Wireman did not appear to be in any acute distress, was alert, cooperative and oriented with good mental status. (R. at 519.) Dr. Blackwell's examination revealed all normal findings. (R. at 519-20.) Specifically, he found Wireman's abdomen to be soft and nontender with positive bowel sounds, no distention, no rigidity, guarding or rebound. (R. at 520.) On Wireman's musculoskeletal examination, Dr. Wireman found that his gait was symmetrical and balanced, upper and lower joints showed no effusions or obvious deformities, upper and lower extremities were normal for size, shape, symmetry and strength, grip strength was good and equal bilaterally at 5/5, fine motor movement and skill activities of the hands were normal, and reflexes in the upper and lower extremities were good and equal bilaterally at 4/4. (R. at 520.)

Dr. Blackwell stated that, based on his examination and Wireman's history, Wireman should be able to sit for four hours and stand for one hour in an eight-hour day with positional changes every 15 minutes. (R. at 520.) Dr. Blackwell stated that Wireman could overhead reach with each arm one-third of the day, but should avoid any foot pedal operation. (R. at 520.) He also stated the Wireman could not perform any crouching, crawling, work around unprotected heights or repetitive and continuous stair climbing. (R. at 520.) He stated that Wireman could lift up to 20 pounds occasionally and 10 pounds frequently. (R. at 520.) He also recommended that Wireman avoid squatting or kneeling. (R. at 520.)

X-rays of Wireman's lumbar spine taken on May 17, 2013, showed evidence of spina bifida occulta at the L-5 level with no significant degenerative change noted. (R. at 523.)

State agency physician William Amos, M.D., completed a Physical Residual Capacity Functional Capacity Assessment of Wireman on May 28, 2013. (R. at 115-17.) Dr. Amos stated that Wireman could lift and carry items weighing up to 20 pounds occasionally and 10 pounds frequently. (R. at 115.) He stated that Wireman could stand and/or walk about six hours and sit about six hours in an eight-hour workday. (R. at 115.) He stated that Wireman's ability to push/pull hand or foot controls was limited only by his lift/carry weight restrictions. (R. at 115.) Dr. Amos stated that Wireman could never climb ladders, ropes or scaffolds or crawl, could occasionally climb ramps or stairs, stoop, kneel and crouch, could frequently balance and should avoid concentrated exposure to hazards such as machinery and heights. (R. at 116-17.)

Wireman saw Dr. Warren Andrew Chang, M.D., on June 19, 2013, for a follow up of multiple medical issues. (R. at 526-27.) Wireman complained of a

lesion over his right upper eyelid. (R. at 526.) Musculoskeletal examination on this occasion showed no joint effusion, no joint space tenderness and normal ranges of movement. (R. at 527.) Dr. Chang diagnosed a seborrheic kerotoses of the upper eyelid. (R at 527.) Dr. Chang stated that he would refer Wireman to an ophthalmologist for treatment. (R. at 527.)

Wireman saw Dr. Chang again on July 9, 2013, for complaints of acute back pain after performing yard work. (R. at 524.) Wireman told Dr. Chang that he suffered from degenerative disc disease and a history of colon cancer. (R. at 524.) Wireman described his back pain as sharp and excruciating, and he rated it a nine on a 10-point scale, which worsened with movement and eased with rest. (R. at 524.) Dr. Chang noted that Wireman's review of symptoms was normal except for complaints of back pain radiating down his leg. (R. at 524.) Dr. Chang noted significant joint space tenderness in the lumbar spine around the L4-5 level. (R. at 524.) He also noted some degree of muscle spasms with rotational movements of the spine limited due to pain. (R. at 524.) He also noted that straight leg raises were positive in both lower extremities, more marked in the right leg, Faber's sign was positive in the right leg with normal sensory examination and reflexes difficult to elicit. (R. at 524.)

Dr. Chang noted that it was likely that Wireman had a herniated disc. (R. at 525.) He stated that he would treat Wireman conservatively with cold compresses, prednisone, Flexeril, Celebrex and Ultram. (R. at 525.) He stated that if there was no improvement in the next three days, he would consider ordering an epidural injection. (R. at 525.)

Wireman saw Dr. Armstrong on August 19, 2014, for complaints of pressure and abdominal burning down low. (R. at 540-41.) Wireman also complained of

abdominal bloating and constipation. (R. at 541.) Dr. Armstrong noted that Wireman had done "very, very well with … mesorectal excision and has had no evidence of recurrent disease in his follow up." (R. at 540.) Wireman complained of significant back pain and told Dr. Armstrong that he had "slipped discs in three areas." (R. at 540.) Dr. Armstrong noted no sensory or motor deficits in Wireman's upper or lower extremities. (R. at 541.) Dr. Armstrong ordered a colonoscopy. (R. at 541.)

A CT scan of Wireman's abdomen and pelvis, dated October 3, 2014, showed no evidence of recurrent neoplasm or metastatic disease. (R. at 548.) Dr. Armstrong performed a colonoscopy on September 18, 2014. (R. at 545.) Dr. Armstrong removed one polyp during the procedure. (R. at 545.)

Wireman saw Dr. Armstrong again on October 7, 2014, for follow up from his low anterior resection. (R. at 539.) Dr. Armstrong noted that overall Wireman was doing very well. (R. at 539.) Wireman complained of some acid reflux symptoms and back pain and sciatica. (R. at 539.) Dr. Armstrong noted that he would try to make a referral for pain management. (R. at 539.) Dr. Armstrong stated that he would see Wireman in one year. (R. at 539.)

Wireman returned to Dr. Armstrong on October 6, 2015. (R. at 555.) Dr. Armstrong noted that Wireman had "done great from a cancer standpoint." (R. at 555.) Dr. Armstrong noted that he had a lot of trouble with his sciatica, but that Wireman stated that he could not afford pain management treatment. (R. at 555.) Dr. Armstrong wrote Wireman prescriptions for a Medrol dose pack, Skelaxin and Lortab. (R. at 555.) He said that he would see him back in a year. (R. at 555.)

Dr. Sung-Joon Cho, M.D., performed a consultative evaluation of Wireman on November 14, 2015, at the request of the state agency. (R. at 561-64.) Dr. Cho noted that Wireman's chief complaint was abdominal pain, which he described as stabbing pain running into his back. (R. at 561.) Wireman denied any problem with diarrhea, vomiting or nausea, but complained of infrequent bowel movements. (R. at 561.) Wireman's abdomen was soft and nontender with positive bowel sounds. (R at 562.) At another point, Dr. Cho stated that Wireman's abdomen did have some tenderness. (R. at 563.)

Dr. Cho noted that Wireman was comfortable with grip strength at 5/5 in both hands. (R. at 563.) Dr. Cho also noted that Wireman's coordination, station and gait were unremarkable, although he walked a little stiff. (R. at 563.) He said that Wireman could squat, but did so cautiously. (R. at 563.) He noted that straight leg raises were negative bilaterally. (R. at 563.) Dr. Cho stated that Wireman's motor function was 5/5 in the upper and lower extremities. (R. at 563.) Wireman's lumbar flexion was limited to 70 out of 90 degrees, and shoulder abduction was limited to 120 out of 180 degrees bilaterally due to chronic shoulder pain. (R. at 563.)

Dr. Cho stated that Wireman could sit for six hours, stand for two hours and walk for two hours in and eight-hour work period. (R. at 564, 567.) He stated that Wireman could lift up to 10 pounds continuously, 20 pounds frequently and 30 pounds occasionally. (R. at 564, 567.) He stated that Wireman could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 564, 570.) Dr. Cho stated that Wireman could reach and push/pull occasionally, but handle, finger and feel without limitation. (R. at 564, 569.) He stated that Wireman could use foot controls continuously. (R. at 569.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2017). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2017).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011, West 2012 & Supp. 2017); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by

substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Wireman argues that the ALJ's decision was not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6.) In particular, Wireman argues that the ALJ failed to properly evaluate and consider opinions from his examining medical sources. (Plaintiff's Brief at 7-12.) Wireman argues that the ALJ did not adequately explain why he rejected portions of the opinions from examining physicians Dr. Sung-Joon Cho and Dr. Kevin Blackwell. (Plaintiff's Brief at 7-12.) Specifically, Wireman argues, the ALJ did not explain why he rejected Dr. Cho's reaching limitations and Dr. Blackwell's postural limitations on squatting and kneeling.

In his opinion, the ALJ stated that he gave "some weight" to the residual physical capacity assessments of the consulting physicians Dr. Cho and Dr. Blackwell. (R. at 27-28.) Regarding Dr. Cho's opinions, the ALJ stated that he was rejecting Dr. Cho's findings, except for his limitations of standing and walking and only occasional pushing or pulling, because Dr. Blackwell's assessment supported imposing greater restrictions. (R. at 27-28.) Regarding Dr. Blackwell's assessment, the ALJ stated that the "postural, overhead reaching, and push/pull limitations assessed by Dr. Blackwell are reasonably necessary, considering the claimant's combined medically determinable impairments." (R. at 27.) Thus, it appears that the ALJ intended to give Dr. Blackwell's postural limitations controlling weight. The ALJ even noted that Dr. Blackwell's postural limitations included a restriction against operating foot pedals, crouching, crawling, squatting

and kneeling. (R. at 27.) Nonetheless, the ALJ found that Wireman could occasionally operate foot controls and kneel. (R. at 21.)

It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight [she] has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Here, the ALJ specifically stated that Dr. Blackwell's push/pull and postural limitations were "reasonably necessary." (R. at 27.) Despite this finding, the ALJ did not include these limitations in his residual functional capacity finding. What is even more confusing, is that the ALJ specifically rejected the state agency medical consultant's physical assessment and the portion of Dr. Cho's physical assessment stating that Wireman could occasionally kneel. (R. at 28.)

Based on this internal inconsistency in the ALJ's findings, I will recommend that the court vacate the Commissioner's decision denying benefits and remand the case for further development.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's residual functional capacity finding; and

2. Substantial evidence does not exist in the record to support the Commissioner's finding that Wireman was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Wireman's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Wireman's claims to the Commissioner for further development.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2017):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record and unrepresented parties at this time.

DATED: May 10, 2018.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE